# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ARNOLD ROTH, *et al.*, <br>       **Plaintiffs,** <br><br>     v. <br><br> SYRIAN ARAB REPUBLIC, *et al.*, <br>       **Defendants.** | Civil No. 1:14-cv-01946-RCL |

## MEMORANDUM OPINION

Plaintiffs have brought claims pursuant to the Foreign Sovereign Immunities Act (FSIA) against the Syrian Arab Republic (Syria) and the Syrian Air Force Intelligence. Plaintiffs seek damages for injuries suffered as a result of a terrorist attack committed in Jerusalem, Israel on August 9, 2001. The Court has before it the plaintiffs' motion for default judgment. ECF No. 45. For the reasons set forth below, the Court concludes that plaintiff's motion will be **GRANTED**.

## I.  PROCEDURAL HISTORY

Plaintiffs first filed their original complaint on July 28, 2011, pleading causes of action against the Islamic Republic of Iran (Iran), the Iranian Ministry of Information and Security (MOIS), Syria, and the Syrian Air Force Intelligence. Pls.' Complaint, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (RCL) (D.D.C. July 28, 2011), ECF No. 3. Plaintiffs were originally unable to complete service of process on Syria and the Syrian Air Force Intelligence, which led this Court to sever plaintiffs' claims against Syria and the Syrian Air Force Intelligence on November 19, 2014. Order, ECF No. 1. The Court decided the case against Iran and the MOIS in *Roth I. Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379 (D.D.C.

2015) [hereinafter *Roth I*]. This opinion now addresses plaintiffs' claims against Syrian and the Syrian Air Force Intelligence.[1]

Plaintiffs' causes of action and this Court's jurisdiction are premised on § 1605A of the FSIA. Syria and the Syrian Air Force Intelligence were served with process on July 2, 2017. ECF No. 41. Their answer was due on August 31, 2017. *Id.* Defendants made no response and have yet to appear in this case. The Clerk of the Court entered default against defendants on September 28, 2017. ECF No. 43. Plaintiffs have now moved for entry of default judgment against defendants, both as to liability and damages. Pls.' Mot. for Default J., ECF No. 45.

## II.   FINDINGS OF FACT

The Court must consider evidence and make findings of fact with respect to plaintiffs' allegations before determining whether defendants should have a default judgment against them. This is because § 1608(e) of the FSIA prohibits courts from entering a default judgement against a foreign state or its political subdivision unless "the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). Therefore, the Court cannot "simply accept a complaint's unsupported allegations as true." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010). Rather, courts must "inquire further before entering judgment against parties in default." *Id.* (internal quotations omitted). Courts may rely on uncontroverted factual allegations that are supported by affidavits. *Id.* Also, courts may take judicial notice of prior related proceedings in cases before the same court. *Id.*

## A. Judicial Notice of Prior, Related FSIA Cases

Under Federal Rule of Evidence 201(b), courts may "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources

---

[1] All references to "defendants" in this opinion refer only to Syria and the Syrian Air Force Intelligence.

whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). This means that a court may "take judicial notice of, and give effect to, its own records in another but interrelated proceeding." *Opati v. Republic of Sudan*, 60 F.Supp.3d 68, 73 (D.D.C. 2014) (quoting *Booth v. Fletcher*, 101 F.2d 676, 679 n.2 (D.C. Cir. 1938)). In light of this authority and the numerous FSIA cases in recent years giving rise to nearly identical factual and legal issues, this Court and others in this District have frequently taken judicial notice of earlier, related cases arising under the state-sponsored terrorism exception to foreign sovereign immunity. *See, e.g.*, *Fain v. Islamic Republic of Iran*, 856 F. Supp. 2d 109, 115 (D.D.C. 2012) (collecting cases).

The Court may not simply adopt previous factual findings without scrutiny. This is because factual findings "represent merely a court's probabilistic determination as to what happened, rather than a first-hand account of the actual events." *Id.* at 116. As such, courts have concluded that findings of fact are generally considered hearsay, not subject to an enumerated exception to the prohibition on hearsay evidence in the federal rules. *Rimkus*, 750 F. Supp. 2d at 172. This does not mean, however, that courts in later, related FSIA proceedings are given the "onerous burden of re-litigating key facts in related cases arising out of the same terrorist attack." *Id.* Instead, courts adjudicating related FSIA cases may "rely upon the evidence presented in earlier litigation— without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Id.* As stated above, the records of this Court in related proceedings are not subject to reasonable dispute. *See Opati*, 60 F. Supp. 3d at 73. Thus, the type and substance of evidence previously presented to this Court in prior proceedings may be judicially noticed in the process of reaching findings of fact in this case.

The Court decided the related case of *Roth I* in 2015. *Roth* I, 78 F. Supp. 3d at 379. *Roth I* involved the same plaintiffs and the same attack upon which this suit is based. The Court shall take

judicial notice of the findings of fact in that case. Further, on May 19, 2006, the Court presided over a hearing on liability in the case of *Greenbaum v. Islamic Republic of Iran*, 451 F. Supp. 2d 90, 95 (D.D.C. 2006). There the Court received evidence regarding the August 9, 2001 attack upon which this suit is also based. *Id.* at 94–95. The Court shall take judicial notice of that evidence in making its findings of fact. The evidence received in *Greenbaum* was also judicially noticed in *Roth I. Roth I*, 78 F. Supp. 3d at 387. Further, the Court shall take judicial notice of evidence received in *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 71 (D.D.C. 2017) and *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 32 (D.D.C. 2012), as these cases involved Syria and the Syrian Air Force Intelligence's liability for state sponsorship of terrorism.

**B. The Attack**

On August 9, 2001, Izz al-Din Shuheil Ahmed Masri detonated a ten-pound bomb at a Sbarro restaurant in Jerusalem. Pls.' Ex. List, Ex. 16, U.S. Dep't of State, *Patterns of Global Terrorism 2001* at 54, 80 (2002), *Greenbaum v. Islamic Republic of* Iran, Civil Action No. 02-2148 (RCL) (D.D.C. May 18, 2006), ECF No. 27-9 [hereinafter *Patterns of Global Terrorism*]; Pls.' Supplemental Ex. List, Ex. 18, Catalog/Translation of Evidence, 1–2, *Greenbaum*, Civil Action No. 02-2148 (RCL), ECF No. 28-6.[2] The resulting explosion killed 15 people, including plaintiff Malka Roth. *Patterns of Global Terrorism* at 80.

Shortly afterwards, it became clear that Hamas was ultimately responsible for the attack. *Patterns of Global Terrorism* at 54; Patrick Clawson Dep. 18:2–8, May 24, 2006, *Greenbaum*, Civil Action No. 02-2148 (RCL), ECF No. 28-2 [hereinafter Clawson Dep.]. This conclusion was supported by the following factors:

> [A] living will videotape of the bomber made by the bomber beforehand in which
> he describes himself as being a member of Hamas and says he's going to carry out

---

[2] This source is an English translation of an Israeli police file relevant to the August 9, 2001 attack. The translation was made by an individual employed by the Washington Institute for Near East Policy.

a suicide bombing; the description after the bombing by the bomber's father of his son as being a member of Hamas; and, furthermore, the court evidence and the interviews with the two individuals who were subsequently arrested for having helped the bomber identify the target and get him to the target in which they describe themselves as members of Hamas . . . .

Clawson Dep. 18:8–19:1.

## C. Defendants' Actions and Involvement in the Attack

Hamas is described by the State Department as an "outgrowth of the Palestinian branch of the Muslim Brotherhood" that uses "both political and violent means, including terrorism, to pursue the goal of establishing an Islamic Palestinian state in place of Israel." *Patterns of Global Terrorism* at 93.

Syria has been continuously designated as a state sponsor of terrorism by the U.S. State Department since 1979. Decl. of Benedetta Berti ¶ 30, *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, Civil Action No. 15-1136 (BAH) (D.D.C. July 19, 2016), ECF No. 33-2 [hereinafter Berti Decl., *Braun*]. In *Braun*, the Court reviewed evidence that indicated in the 1980s, Syria reached an agreement with Hamas in which "Hamas undertook to carry out acts of extrajudicial killing and terrorism against Jews in Israel, the West Bank and Gaza, and in return Syria undertook to provide Hamas with material support and resources to carry out such extrajudicial killings and terrorist attacks." *Braun*, 228 F. Supp. 3d at 71. "Hamas has had a presence in Syrian since at least 1991," Decl. of Marius Deeb ¶ 13, *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, Civil Action No. 15-1136 (BAH) (D.D.C. May 25, 2016), ECF No. 31-2 [hereinafter Deeb Decl., *Braun*], and Syria provided safe haven for Hamas for many years. Berti Decl. ¶ 31, *Braun*. This granted Hamas a base from which to operate, and Syria became a "planning hub" for Hamas in the mid-1990s. Berti Decl. ¶¶ 31–33, *Braun*; Deeb Decl. ¶ 15, *Braun*. In fact, Syrian military intelligence worked closely with Hamas military leaders in Syria, and "[i]nstructions for terrorist

attacks were transmitted directly from Damascus to the terrorist cell that was to carry out the attack." *Id.* While under Syria's protection, "Hamas was able to organize political events from Damascus," Berti Decl. ¶ 40, *Braun*, as well as to "access both [Syria's] military strategists and to Hezbollah's resources in Lebanon, from which Hamas was able to learn terrorist strategies," Deeb Decl. ¶ 23, *Braun.*

Hamas has received financial support channeled through Syria to finance its military operations and terrorist attacks. Berti Decl. ¶¶ 43–44, *Braun.* This Court in *Wultz* examined evidence that the Syrian Air Force Intelligence specifically acted as a conduit for Syria's "provision of funds to terrorist organizations," including Hamas and Palestinian Islamic Jihad, which came from Iran. *Wultz*, 864 F. Supp. 2d at 32; Transcript of Evidentiary Hearing on Feb. 27, 2012, 26:4–27:2, 31:7–32:6, *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, Civil Action No. 08-1460 (RCL) (D.D.C. Mar. 30, 2012), ECF No. 129. Syria has also served as a key channel through which Hamas has smuggled and obtained weapons. Berti Decl. ¶ 44, *Braun.* Further, "Syrian sponsorship and support has enabled Hamas to at times carry out military training in Syria and Lebanon where its operatives have acquired essential tactical skills and knowledge enabling them to carry out ever more sophisticated attacks." *Id.* Ultimately,

> [t]he support which Syria provided to Hamas, by giving the organization and its leaders safe haven, allowing it to operate its military headquarters in Damascus and giving it access to other resources such as unrestrained access to funding, weapons, travel, communications, military training, intelligence and strategy proved significant for the terror organization's overall operational infrastructure.

Deeb Decl. ¶ 19, *Braun.* Although Syria no longer provides support to Hamas, Hamas benefitted from the substantial support that it received from Syria, especially during the period in which the attack at the heart of this matter occurred.[3]

---

[3] Syria and Hamas split in 2012 because of Hamas' support for rebel forces in the Syrian civil war. Syria no longer provides support to Hamas as a result of this split. Berti Decl. ¶ 45, *Braun.*

### D. Plaintiffs' Status and Injuries

The Court now makes findings regarding each plaintiff, including the injuries each plaintiff suffered as a result of the August 9, 2001 attack and each plaintiff's citizenship (as is relevant to their entitlement to recover under § 1605A of the FSIA).

### 1. Malka Roth

Plaintiff Malka Roth was killed in the August 9, 2001 attack. Arnold Roth Decl. ¶ 2, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2014), ECF No. 34-2 [hereinafter Arnold Roth Decl., *Roth I*]. She was 15 years old. *Id.* ¶ 3. She is represented in this litigation by her parents, Arnold and Frimet Roth, who serve as co-administrators of her estate. Compl., ECF No. 4; Pls.' Supp. Mem. Ex. A, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Jan. 16, 2015, 2016), ECF No. 42-1. Malka Roth was a United States citizen. Arnold Roth Decl. ¶ 3, *Roth I*.

### 2. Immediate family of Malka Roth

The other plaintiffs in this case are all immediate family members of Malka Roth. Arnold and Frimet Roth are her parents and Pesia Roth, Rivka Roth Rappaport, Zvi Roth, Shaya Roth, Pinchas Roth, and Haya Elisheva Roth are her siblings. All except Arnold Roth are United States citizens.[4] All reside in Jerusalem, Israel. Arnold Roth Decl. ¶ 6, *Roth I*. Arnold Roth and Haya Elisheva Roth have filed a notice of voluntary dismissal without prejudice as to their claims pled in their individual capacities. ECF No. 44. Because defendants have not filed an answer or a motion

---

[4] Arnold Roth Decl. ¶¶ 2, 5, 26, *Roth I*; Frimet Roth Decl. ¶¶ 3, 7, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-3; Rivka Roth Rappaport Decl. ¶¶ 2, 4, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-6; Zvi Roth Decl. ¶¶ 2, 4, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-7; Shaya Roth Decl. ¶¶ 2, 4, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-8; Pinchas Roth Decl. ¶¶ 2, 4, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-9; Pesia Roth Decl. ¶¶ 2, 4, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-10.

for summary judgment, Arnold Roth and Haya Elisheva Roth's claims were dismissed without prejudice upon filing of this notice. Fed. R. Civ. P. 41(a)(1)(A)(i).[5]

Each plaintiff has alleged emotional injuries resulting from Malka Roth's death. These injuries are detailed below.

### a. Frimet Roth

Frimet Roth first heard of the bombing a few minutes after it occurred through a CNN news report. Frimet Roth Decl. ¶ 8, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-3. She was immediately concerned for the safety of three of her children who were out on the streets of Jerusalem. *Id.* While two returned home a half hour later unharmed, Malka did not appear and did not respond to repeated phone calls. *Id.* Later in the day, Frimet set out for Shaarei Zedek Medical Center to search for her daughter, accompanied by the mother of Malka's best friend, who had been with Malka that day. *Id.* During the journey, Frimet learned that Malka's friend had sent a text message shortly before the bombing stating that the two girls were going to Sbarro. *Id.* At that point, Frimet stated, she "knew that the worst had happened and broke down banging on the car window and crying." *Id.* After returning home, she waited with her family and some neighbors, "moaning uncontrollably" while waiting for news. *Id.* Finally, around 2 a.m. the following morning, her sons Pinchas and Shaya called from the government's pathology lab. *Id.* ¶¶ 8–9. Arnold took the call; Frimet recounted that just by reading his reaction, she knew that Malka's death had been confirmed. *Id.* ¶ 9. Frimet now mournfully recalls this moment as a cruel culmination with indelible effects: "The trauma of the evening and night leading up to that moment and then of the hours immediately after are impossible for me to describe. They will never leave me. They changed my life forever." *Id.*

---

[5] Arnold Roth's claims made in his capacity as representative of Malka Roth's estate remain.

Frimet states that her pain at Malka's death "has never left [her] for a moment." *Id.* ¶ 10. Indeed, because the mere memory of her daughter triggers such powerful sadness, she willfully suppresses her memories of Malka "in order to function, to plod ahead with life." *Id.* ¶ 11. Nonetheless, her declaration affirms her powerful love for Malka, detailing her admiration and gratitude for Malka's many positive qualities, including Malka's ardent devotion to her disabled sister, Haya Elisheva. *Id.* ¶¶ 12–16.

### b. Rivka Roth Rappaport

Rivka Roth Rappaport is Malka Roth's sister, three and a half years Malka's junior. Rivka Roth Rappaport Decl. ¶ 3, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-6. Rivka states that she and Malka were "very close" growing up. *Id.* ¶ 7. Indeed, during that time they shared a bedroom and attended the same school and youth group. *Id.* Rivka remembers the day and night spent waiting for news of Malka's fate as traumatic; she recalls crying and being distraught at the news Malka's best friend had been killed. *Id.* ¶ 14 (characterizing the night's uncertainty as "excruciating"). She knew Malka had died when she awoke to hear her mother "wailing and moaning" at the news. *Id.* ¶ 15.

Rivka declares that she has experienced emotional trauma and physical pain from her sister's death. *Id.* ¶ 16. She visited a psychologist once or twice but did not go regularly because of her skepticism of therapy at the time. *Id.* She now regrets that decision. *Id.* Rivka states that her life will never be the same as a result of the attack. *Id.* ¶ 17.

### c. Zvi Roth

Zvi Roth is Malka Roth's brother, born two and a half years before her. Zvi Roth Decl. ¶¶ 2–3, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-7. He states that he and Malka were "very close" growing up. *Id.* ¶ 7.

They spent a great deal of time together, doing things like playing together and going to the swimming pool. *Id.* Like his sister Rivka, Zvi recalls the night waiting for news about Malka after the attack as being "very difficult." *Id.* ¶ 13. Upon hearing of his sister's death, he felt "terribly exhausted" and like "everything in my life was collapsing." *Id.* ¶ 14.

Zvi states that he has suffered emotional trauma and physical pain as a result of Malka's death. *Id.* ¶ 15. In the aftermath, he had trouble "studying and socializing" and felt isolated by his experience and his grief. *Id.* He "received grief counseling from both a psychologist and from a social worker." *Id.* He states that his life will never be the same without Malka and that he misses her and regrets that his memories of her are fading from clarity. *Id.* ¶¶ 8, 16.

### d. Shaya Roth

Shaya Roth is Malka Roth's brother. Shaya Roth Decl. ¶ 2, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-8. He is four and a half years older than her. *Id.* ¶ 3. Shaya declares that he and Malka were very close as young children but that they grew apart somewhat as teenagers because of the busy schedule and expanding social life that attends adolescence. *Id.* ¶ 7. Nonetheless, Shaya recounts anecdotes of his relationship with Malka from the summer of 2001 that demonstrate the continued affection the two shared for one another up until her death. *Id.* ¶ 11 (describing a "refreshing and enjoyable" hike they took together that is one of Shaya's favorite memories of his sister); *id.* ¶ 12 (recalling that a couple of days before her death, Malka gave Shaya a shopping bag full of snacks to take with him in anticipation of his enlistment in the army, a gesture that "moved" Shaya so much that he kept the snacks for months after her death, unable to eat or discard them).

Shaya, along with his older brother Pinchas, traveled to the Israeli government pathology center at Abu Kabir in the morning following the attack at 2 a.m. *Id.* ¶ 15. They went to determine

whether a body at the center potentially matching Malka's description was indeed their sister. *Id.*

Shaya's declaration vividly describes the events that followed:

> I will never forget my wandering thoughts on the long drive to Abu Kabir; my deliberation while looking at her body lying on the clinic's bed, knowing it was her but hesitating to declare it and making it official and all the while having a glimmer of doubt or hope that I may be making a mistake and that Malka is alive somewhere; the call home to say I had found her body – talking to my father and hearing my mother crying in the background; and then the long drive home in silence.

*Id.*

Like his siblings, Shaya states that he has suffered emotional trauma and physical pain as a result of Malka's death. *Id.* ¶ 16. In particular, Shaya highlighted the difficulty of being a new soldier in the wake of the attack, with his only relief from the rigors of military life being emotionally difficult weekends on leave at home with a family now "severely limited" in its ability to "function healthily as a supportive and constructive force" in his life. *Id.* ¶¶ 8, 16. He affirms that he misses Malka, that he regrets that she will not be a presence in the lives of his family, and that he believes his life will never be the same without her. *Id.* ¶ 17.

### e. *Pinchas Roth*

Pinchas Roth is Malka Roth's brother and is seven and a half years older than her. Pinchas Roth Decl. ¶ 3, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-9. Pinchas states that, like the other plaintiffs, he spent the time immediately following the attack "frantically trying to find some information about where [Malka] might be." *Id.* ¶ 8. He was given the difficult task, along with his brother Shaya, of identifying Malka's body shortly thereafter. *Id.* ¶ 9. Pinchas states that he experienced emotional trauma and physical pain because of Malka's death. *Id.* ¶ 10. He recalls that the attack resulted in his having "trouble moving around in public places among strangers, for fear that one of them might be carrying a bomb." *Id.* He participated in individual and group therapy for several years.

*Id.* Pinchas declares that he misses talking to his sister and sharing stories with her; he believes his life will never be the same without her. *Id.* ¶ 11.

### f. Pesia Roth

Pesia Roth is Malka Roth's sister and is seven years younger than Malka. Pesia Roth Decl. ¶¶ 2–3, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (D.D.C. Oct. 2, 2016), ECF No. 34-10. Despite their age gap, Pesia states that she and Malka were "very close." *Id.* ¶ 7. They would "sing and play music together, have deep and meaningful conversations (despite our age gap she would talk to me at eye level), play cards, [and] go swimming." *Id.* Pesia viewed Malka as an "incredible big sister," a person who was "very precious" to her. *Id.*

Like many members of her family, Pesia states that she was distraught while waiting for news about Malka, crying as she waited. *Id.* ¶ 13. She states that she experienced emotional trauma and physical pain as a result of Malka's death. *Id.* ¶ 15. She received counseling as treatment for this trauma, including from professional psychologists. *Id.* Pesia believes that her life will never be the same without Malka. *Id.* ¶ 16.

## III. CONCLUSIONS OF LAW

### A. Jurisdiction and Sovereign Immunity

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The FSIA codifies specific exceptions to foreign sovereign immunity that provides the sole authority for a district court to assert subject matter jurisdiction over claims against a foreign state. *Odhiambo v. Republic of Kenya*, 764 F.3d 31, 34 (D.C. Cir. 2014). The D.C. Circuit has stated that "if no exception applies the district court has no jurisdiction." *Id.*

District courts must decide whether an exception to foreign sovereign immunity applies "even if the foreign state does not enter an appearance to assert an immunity defense." *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 493 n.20 (1983). This is because courts would lack subject matter jurisdiction unless there is an exception to foreign sovereign immunity and "[s]ubject-matter jurisdiction can never be waived or forfeited." *Gonzalez v. Thaler*, 565 U.S. 134, 141 (2012). Thus, "[w]hen a requirement goes to subject-matter jurisdiction, courts are obligated to consider *sua sponte* issues that the parties have disclaimed or have not presented." *Id.*

### 1. Original Jurisdiction

Federal district courts have original jurisdiction over FSIA under 28 U.S.C. § 1330. Section 1330 provides that district courts have original jurisdiction over (1) nonjury civil actions (2) for claims seeking relief *in personam* (3) against a foreign state (4) when the foreign state is not entitled to immunity either under §§ 1605–1607 of Title 28. 28 U.S.C. § 1330(a).

All of the requirements in § 1330(a) are met in this case. First, plaintiffs have not demanded a jury trial—this is a nonjury civil action. Second, this is a suit against defendants as legal persons, which means that the claims in this case seek relief *in personam*. *Cf. Gang Luan v. United States*, 722 F.3d 388, 399 n.15 (D.C. Cir. 2013) ("*In personam* jurisdiction is jurisdiction over the defendant."). Third, this suit is against a "foreign state." The defendants in this case, Syria and the Syrian Air Force Intelligence, are both foreign states under the FSIA. Syria is clearly a foreign state. The Syrian Air Force Intelligence is also a foreign state under the FSIA. Under the FSIA, a "foreign state . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state." 28 U.S.C. § 1603(a). The D.C. Circuit has adopted a "categorical approach" to determining the status of foreign government-related entities for purposes of FSIA's jurisdiction and service of process provisions. *Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 (D.C.

2003). The D.C. Circuit has stated that "if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state." *Id.* The Syrian Air Force Intelligence is an intelligence service and serves as a conduit of Syrian funds to terrorist organizations. *Malina v. Syrian Arab Republic*, Civil Action No. 11-93 (JMF), 2013 WL 12308199, at *1 (D.D.C. Nov. 13, 2013); *Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, Civil Action No. 06-727 (JMF), Civil Action No. 08-529 (JMF), 2013 WL 351546, at *21 (D.D.C. Jan. 29, 2013), *amended sub nom. Estate of Buonocore v. Great Socialist People's Libyan Arab Jamahiriya*, 2013 WL 653921 (D.D.C. Mar. 13, 2013); *Wultz*, 864 F. Supp. 2d at 32; *Certain Underwriters at Lloyd's London v. Great Socialist People's Libyan Arab Jamahiriya*, 811 F. Supp. 2d 53, 70 (D.D.C. 2011). Intelligence gathering and conducting operations are core government functions, not commercial. *See Roth I*, 78 F.Supp.3d at, 393. Thus, the Syrian Air Force Intelligence constitutes a "foreign state" under the FSIA. *See Gates v. Syrian Arab Republic (Gates I)*, 580 F. Supp. 2d 53, 64 (D.D.C.2008) (citing *Roeder*, 333 F.3d at 234). The fourth and final requirement for subject matter jurisdiction under § 1330(a) is that there must be an exception to foreign sovereign immunity. This is analyzed in the following subsection.

a. *Sovereign Immunity*

The FSIA provides a state sponsor of terrorism exception to foreign sovereign immunity. 28 U.S.C. § 1605A. Section 1605A states that foreign states do not have immunity

in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

*Id.* Each element of this section are met. Plaintiffs only seek monetary remedies for their injuries in this case. As discussed *supra*, both defendants, Syria and the Syrian Air Force Intelligence, are foreign states under the FSIA. Further, plaintiffs have proven instances of personal injury or death, and plaintiffs have proven that their claims arise from these instances. Under § 1605A, such injury or death "must merely be the bases of a claim for which money damages are sought." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). Jurisdiction is not restricted to physical injury suffered directly by each claimant. *Id.* Thus, plaintiffs' various claims for emotional injuries to Malka's family and economic losses to her estate, all of which spring from Malka's death in the bombing, constitute the type of claims required for jurisdiction.

Finally, the "causation" element of § 1605A(a) is established in this case. The plaintiffs do not need to show that their injuries would not have occurred "but for" defendants' actions to meet the causation element. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (interpreting the similarly-worded causation requirement of the former state-sponsored terrorism exception to foreign sovereign immunity, § 1605(a)(7), as requiring only "proximate cause"). Instead, the "causation" element is established by showing "some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered." *Valore*, 700 F. Supp. 2d at 66 (D.D.C. 2010). Here, plaintiffs have sufficiently demonstrated a "reasonable connection" between defendants' acts and their damages. The facts found by the Court demonstrate that defendants: (1) provided substantial support to Hamas through provision of a safe haven from which to plan attacks, financial support, training, and weapons, and (2) encouraged terrorist activities, especially against Israeli targets. These acts have a reasonable connection to the attack ultimately carried out by Hamas on August 9, 2001. This is sufficient for the relatively low proximate cause bar imposed by the FSIA.

Also, plaintiffs' claims must arise out of "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1). This act or provision of material support must be engaged in by an officer, employee, or agent of the foreign state within the scope of the actor's office, employment, or agency. *Id.*

In this context, provision of material support or resources has the same meaning as it is given in § 2339A of Title 18 of the U.S. Code. 28 U.S.C. § 1605A(h)(3). That section defines "material support or resources" as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1).

Extrajudicial killing has the same meaning as it is given in § 3 of the Torture Victim Protection Act of 1991. 28 U.S.C. § 1605A(h)(7). That section defines extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." *See* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73 (excluding from the definition killings that are lawful under international law).

The August 9, 2001 bombing caused the deaths of innocent civilians, including Malka Roth. Those individuals were killed by the malicious design of the terrorists who carried out the attack—not according to the judgment of a regularly constituted court. Thus, the bombing was an "extrajudicial killing" as defined by the FSIA. Defendants provided "material support or resources" for this act by their provision of a safe haven from which to plan attacks, financial

support, training, and weapons to Hamas and its members. Finally, this provision of material support or resources was within the scope of the provider's office, employment, or agency. As set forth above, Syria, which is a foreign state, provided this material support to Hamas and the Syrian Air Force Intelligence, treated as the foreign state itself, served as a conduit for the provision of funds to Hamas.

Thus, the final element for waiver of sovereign immunity under § 1605A is met and defendants are not entitled to sovereign immunity. Because all of § 1330(a)'s requirements for jurisdiction are satisfied, the Court possesses original jurisdiction over this matter.

### 2. Requirements for a claim to be heard

Section 1605A only applies if three conditions are met: (1) the foreign state was designated a state sponsor of terrorism at the time of the act giving rise to liability or was so designated in response to such act and remains so designated; (2) the claimant or victim was a national of the United States at the time of the act waiving sovereign immunity[6]; and (3) in cases where the act occurred in the foreign state against whom suit has been brought, the foreign state was afforded a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration. 28 U.S.C. § 1605A(a)(2). Each of these conditions is met here.

First, Syria was designated a state sponsor of terrorism in 1979. *Gates v. Syrian Arab Republic*, 646 F.3d 1, 2 (D.C. Cir. 2011). This designation meets § 1605A's definition of "state sponsor of terrorism." 28 U.S.C. § 1605A(h)(6). Syria continues to be designated as a state sponsor of terrorism to this day. *State Sponsors of Terrorism*, U.S. Dep't of State, http://www.state.gov/j/ct/list/c14151.htm (last visited Sept. 26, 2018). Because Syria was a

---

[6] Two other categories of claimants or victims that would meet § 1605's requirements are not relevant here.

designated state sponsor of terror at the time of the incident underlying plaintiffs' claims and because it continues to be so designated, the first condition for a claim to be heard is met.

Plaintiffs meet the second requirement because all claimants or victims are nationals of the United States. Malka Roth and all members of her family that bring claims on their own behalf are citizens of the United States.

Finally, plaintiffs have met the third requirement because the "act" described in subsection (a)(1)—i.e. the act of extrajudicial killing—occurred in Israel, not the defendant state. Thus, plaintiffs were not required by statute to afford defendants a reasonable opportunity to arbitrate.

### 3. Personal jurisdiction

Federal courts have personal jurisdiction over a foreign state if (1) the court has jurisdiction pursuant to § 1330(a) and (2) service has been properly made under § 1608 of the FSIA. 28 U.S.C. § 1330(b). As established above, the requirements for jurisdiction under § 1330(a) are met in this case. The Court next proceeds to an analysis of § 1608's requirements for service.

Section 1608(a) requires that service upon a foreign state or a political subdivision of a foreign state—such as the Syrian Air Force Intelligence—be completed in one of four ways. 28 U.S.C. § 1608(a). The methods are presented in order of preference; a method of service must be unavailable or unsuccessful for a party to attempt service under a later method. *Id.* The first three methods are: (1) delivery of a copy of the summons and complaint in accordance with any special arrangement for service between plaintiff and the foreign state, (2) delivery of the same documents in accordance with an applicable international convention on service of judicial documents, or (3) delivery of the same documents as well as a notice of suit, all translated into the foreign state's official language, by mail, return receipt requested. 28 U.S.C. § 1608(a)(1–3). The Court is not aware of any special arrangement for service between these parties and no international convention

on service applies. Plaintiffs were thus authorized to attempt service under subsection 3. Their attempt was unsuccessful; defendants returned the documents unexecuted a few weeks after their mailing. ECF No. 12.

Therefore, plaintiffs were authorized to effect service under § 1608(a)(4). That provision authorizes service

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a)(4). The Clerk of the Court certified mailing the specified documents, translated as required, to the State Department on May 8, 2012. ECF No. 23. The State Department subsequently confirmed transmission of the documents to the Syrian Ministry of Foreign Affairs by way of the Foreign Interests Section of the Embassy of the Czech Republic in Damascus, Syria. ECF No. 41. Certified copies of the diplomatic notes showing the date of transmission—July 2, 2017—were attached thereto. *Id.* In light of these filings, the Court concludes that plaintiffs have complied with § 1608(a)(4) and have, therefore, properly served defendants in accordance with the FSIA. The Court may exercise personal jurisdiction over defendants.[7]

## B. Timeliness

Section 1605A includes a limitations provision, at subsection (b), setting out a series of time periods within which an action under the section "may be brought or maintained." 28 U.S.C.

---

[7] The Court also notes that no minimum contacts threshold must be met as to the defendants, either as a matter of constitutional or customary international law. *See Valore*, 700 F. Supp. 2d at 70–71 (concluding that neither Iran nor MOIS, as foreign states, were protected by the Fifth Amendment's Due Process Clause and that customary international law did not come into play because it cannot prevail over a contrary federal statute). Satisfaction of § 1330(b) is all that is required for assertion of personal jurisdiction over defendants.

§ 1605A(b). This Court has held that § 1605A's limitations provision is not jurisdictional. *See Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 328–32 (D.D.C. 2014). Nonetheless, the Court shall briefly explore the matter because it concludes that plaintiffs have complied with the statute of limitations.

Section 1605A(b) provides that an action may be brought "10 years after the date on which the cause of action arose." 28 U.S.C. § 1605A(b)(2). The attack giving rise to this action occurred on August 9, 2001. Plaintiffs' cause of action arose on that date. *Cf. Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 994 (D.C. Cir. 2014) (internal citation omitted) (holding that under District of Columbia law, the statute of limitations usually begins running when a plaintiff "sustains a tortious injury"). Plaintiffs filed their original complaint on July 28, 2011, less than 10 years from the date their cause of action arose. Although plaintiffs' claims against Syria and the Syrian Air Force Intelligence were severed on November 19, 2014, these claims relate back to plaintiff's initial complaint. ECF 1. Therefore, plaintiffs' claims are timely under § 1605A of the FSIA.

## C. FSIA Liability

The state-sponsored terrorism exception provides a private right of action. The action is available to, among others, nationals of the United States and the legal representatives of such persons. 28 U.S.C. § 1605A(c). Foreign states that meet subsection (a)(2)(A)(i)'s requirements as state sponsors of terrorism may be held liable under subsection (c). *Id.*

Section 1605A's private right of action has four basic elements. A plaintiff must prove: (1) "an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act" where (2) the act was committed, or the material support was provided, by the foreign state or agent of the foreign state, and the act (3) caused

personal injury or death (4) "for which the courts of the United States may maintain jurisdiction under this section for money damages." *Id.* § 1605A(a)(1), (c).

### 1. Threshold determination of plaintiffs' and defendants' statuses

The Court first determines whether the parties are such that § 1605A(c)'s cause of action may be pursued.

#### a. Defendants are state sponsors of terrorism

Defendants, for the reasons stated above in Part III.A.2, are state sponsors of terrorism within the meaning of § 1605A(a)(2)(A)(i) and may be held liable.

#### b. Entitlement of plaintiffs to bring § 1605A(c) action

All of the plaintiffs may pursue § 1605A(c)'s private right of action. All plaintiffs except Arnold Roth are citizens of the United States and, therefore, fall within § 1605A(c)(1)'s ambit. Arnold Roth, while not himself a United States national, is only before the Court in his capacity as legal representative of Malka Roth's estate. Because Malka Roth is a United States national, Arnold Roth meets § 1605A(c)(4).

#### c. Standing of estate plaintiffs

Arnold and Frimet Roth seek to recover on behalf of Malka Roth as her personal representatives for injuries she suffered during life. They must establish their standing before they may recover for harms suffered during Malka's life. *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12 (D.D.C. 2011) (noting that "recovery for pain and suffering . . . is not universally available to estate-plaintiffs"). The determination of whether an estate may maintain a cause of action for injuries suffered during the decedent's life is a question "governed by the law of the state which also governs the creation of the estate." *Id.* State law governs this issue because it is

not related to the extent and nature of the claims, but instead involves a threshold question regarding the "power of the estate to bring and maintain legal claims." *Id.*

Malka Roth's estate exists under Israeli law. Pls.' Supp. Mem. Ex. A, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (RCL) (D.D.C. Jan. 16, 2015), ECF No. 42-1 [hereinafter Pls.' Supp. Mem. Ex. A, *Roth I*] (Inheritance Order issued by an Israeli government official demonstrating that Malka Roth's estate exists in Israel). Israeli statutory law provides that a deceased tort victim's right to recover for injuries suffered during life passes to his or her estate. Civil Wrongs Ordinance (New Version), 5728–1968, § 19, 2 LSI (New Version) 5 (1972) (as amended) (Isr.). The Inheritance Order submitted by plaintiffs demonstrates that Arnold and Frimet Roth are Malka's heirs under Israeli law. Pls.' Supp. Mem. Ex. A, *Roth I*. Thus, Arnold and Frimet have standing to pursue a survival action on behalf of Malka's estate.

### 2. Act

For the reasons stated in part III.A.1.*a*, the Court finds that the acts giving rise to this case are of the type for which a foreign state may be held liable under § 1605A(c). Specifically, the evidence establishes that acts of extrajudicial killing were committed by members of Hamas and that defendants provided material support in furtherance of those acts.

### 3. Actor

Defendants may only be held liable under § 1605A(c) if the acts of extrajudicial killing were committed or the provision of material support made by defendants themselves or by their agents. 28 U.S.C. § 1605A(c). The facts found by the Court show that the Syrian Air Force Intelligence served as a conduit for Syria's provision of funding to Hamas and its membership. Therefore, Syria itself is treated as having provided material support. *See Roeder*, 333 F.3d at 234 (holding that the actions of a political subdivision of a foreign state are attributable to the foreign

state itself because they are treated as legally the same under the FSIA). Further, Syria provided safe haven, training, and weapons to Hamas, which constitutes material support.

### 4. Theory of recovery—causation and injury

The elements of causation and injury under § 1605A(c) require plaintiffs "to prove a theory of liability" which justifies holding the defendants culpable for the injuries that the plaintiffs have allegedly suffered. *Valore*, 700 F. Supp. 2d at 73; *see also Rimkus*, 750 F. Supp. 2d at 175–76 ("[P]laintiffs in § 1605A actions . . . must articulate the justification for such recovery, generally through the lens of civil tort liability."). While § 1605A(c) requires courts to determine the substantive basis for liability arising under it, the Court is not given the authority (or duty) to articulate "federal common law." *Valore*, 700 F. Supp. 2d at 76. Instead, because liability under § 1605A(c) is based on "statutory rights," federal judges are instructed to "find the relevant law, not to make it." *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003). Thus, judges may not "fashion a complete body of law" in considering claims under § 1605A(c). *Id.* Based on the D.C. Circuit's guidance, district courts in this jurisdiction "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises, as well as those principles that have been adopted by the majority of state jurisdictions" to define the elements and scope of these theories of recovery. *Oveissi*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (quoting *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 61 (D.D.C. 2009)). Plaintiffs seek to recover economic damages arising from Malka's wrongful death, survival damages for her pain and suffering prior to death, and solatium damages for intentional infliction of emotional distress (IIED). The Court will consider each theory of recovery below.

   *a. Wrongful death*

Plaintiffs seek recovery for economic losses accruing to the estate of Malka Roth. This Court has previously determined that a decedent's heirs at law, through the decedent's estate, may bring a wrongful death action under § 1605A(c) "for economic losses which result from a decedent's premature death." *Valore*, 700 F. Supp. 2d at 78 (internal citation omitted). Where defendants are liable for a decedent's extrajudicial killing, as these defendants are, they may be held "liable for the economic damages caused to decedents' estates." *Id.* Plaintiffs have sufficiently proved the validity of their wrongful death theory of recovery against defendants.

### b. *Survival action for pain and suffering*

Plaintiffs seek damages for Malka Roth's pain and suffering between the moment of the bombing and her death. Thus, plaintiffs are seeking to recover by way of a survival claim on a battery theory. A survival claim is one "that could have been brought by the decedent, had he lived to bring it." *Valore*, 700 F. Supp. 2d at 77 (citing Restatement (Second) of Torts § 926). The recovery is limited, however, to harms suffered before death. Restatement (Second) of Torts § 926(a).

Liability for battery arises when defendant "acted 'intending to cause a harmful or offensive contact with . . . , or an imminent apprehension of such a contact' by, those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Valore*, 700 F. Supp. 2d at 77 (alterations in original) (quoting Restatement (Second) of Torts § 13). The Court concludes that element one has been sufficiently proved, as "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Id.* The second element is also established because uncontroverted affidavits establish that Malka was killed by the bombing. Thus, she was met with a "harmful contact." Plaintiffs have stated a valid theory of recovery.

### c. Intentional infliction of emotional distress

Plaintiffs seek to recover solatium damages for defendants' intentional infliction of emotional distress. Relying principally on the Restatement (Second) of Torts, this Court has set out the following standard for recovery on a theory of IIED in § 1605A(c) cases: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46(1)).

An actor may also be liable for IIED to a party against whom the extreme and outrageous conduct was not directed if that party is (1) a member of the victim's immediate family and (2) was present at the time of the extreme and outrageous conduct. *See Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 75 (D.D.C. 2010) (citing Restatement (Second) of Torts § 46(2)(a)). The "immediate family" requirement is strictly construed in FSIA cases; generally, only spouses, parents, siblings, and children are entitled to recover. *Id.* As to the issue of presence, this Court has previously held that one "need not be present at the time of a terrorist attack upon a third person to recover for severe emotional injuries suffered as a result." *Valore*, 700 F. Supp. 2d at 80. This is because terrorism is sufficiently extreme and outrageous to demonstrate that it is intended to inflict severe emotional harm on even those not present at the site of the act. *Id.*

The plaintiffs have stated a valid theory of recovery as to their IIED claims. As this Court has previously held, "[a]cts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Murphy*, 740 F. Supp. 2d at 74 (quoting *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009)). Uncontroverted affidavits submitted by plaintiffs demonstrate that such emotional distress did result. Also, the evidence

establishes that Syria intentionally provided material support to Hamas, and did so with the intent that Hamas would carry out attacks that would cause severe emotional distress. Finally, plaintiffs have proved the additional elements of an IIED claim applicable when the claim is based on actions directed against a third person. Each has established by uncontroverted affidavits that they are Malka Roth's immediate family members. Further, although the family member plaintiffs do not allege that they were present at the site of the attack, this requirement is not imposed when the extreme and outrageous conduct is a terrorist attack such as this.

### 5. Personal injury

For the reasons stated in part III.A.1.*a*, this suit is one for "person injury or death." This element of § 1605A(c)'s private right of action is also met.

### 6. Jurisdiction

For the reasons laid out above in part III.A.1, the Court "may maintain jurisdiction" over this suit. In light of plaintiffs' satisfaction of § 1605A(c)'s requirements, the Court concludes that defendants may be held liable to them on the basis of this statute.

## D. Liability Under Non-Federal Law

In Count II of their complaint, plaintiffs plead a wrongful death action arising under both section 1605A's private right of action and "state common law." Section 1605A(c) authorizes recovery for wrongful death, for the reasons set forth above. Plaintiffs can only have one recovery for their injuries, regardless of the number of theories upon which they base their complaint. *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976) ("Where there has been only one injury, the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues."). Because defendants are liable to plaintiffs under § 1605A(c) and because that subsection explicitly provides for the type of damages that plaintiffs seek in Count

II (upon sufficient proof of course), the Court will proceed only on the basis of the § 1605A(c) claims with respect to Count II. *See Belkin*, 667 F. Supp. 2d at 22–23 (D.D.C. 2009) (declining to proceed on two counts of a complaint because, although the complaint pled causes of action under District of Columbia and Israeli law, the requested damages were duplicative of a wrongful death count arising under § 1605A(c)).

## E. Damages

Having established defendants' liability for plaintiffs' injuries, the Court proceeds to decide the amount of individual damages to which each plaintiff is entitled.

### 1. Legal standard

Damages available under § 1605A's cause of action "include economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Accordingly, deceased plaintiffs' estates can recover economic losses stemming from wrongful death of the decedent; family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages. *Valore*, 700 F. Supp. 2d at 83. The estate of a deceased victim may also recover damages for pain and suffering if it can be proved that the decedent experienced pain and suffering prior to the decedent's death. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000). Finally, in appropriate cases, plaintiffs may recover prejudgment interest on their compensatory damages awards. *Amduso v. Republic of Sudan*, 61 F. Supp. 3d 42, 53–54 (D.D.C. 2014), *aff'd in part, vacated in part sub nom. Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017).

"To obtain damages against a non-immune foreign state under the FSIA, a plaintiff must prove that the consequences of the foreign state's conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of damages by a 'reasonable estimate'

consistent with this [Circuit]'s application of the American rule on damages." *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill v. Republic of Iraq*, 328 F.3d 680, 681 (D.C. Cir. 2003)) (internal quotation marks omitted). As to the issue of a reasonable estimate of damages in cases brought under § 1605A, a court may consider prior damage awards for pain and suffering and solatium as examples for determining an appropriate award for each plaintiff. *Acosta v. Islamic Republic of Iran*, 574 F. Supp. 2d 15, 29 (D.D.C. 2008).

### a. Pain and suffering

Assessing appropriate damages for pain and suffering can depend upon a myriad of factors, such as "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012) (internal citation and quotation marks omitted). Plaintiffs who were killed in the attack giving rise to the cause of action cannot receive an award for pain and suffering if their death was instantaneous. *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 112 (D.D.C. 2000). Also, a court must refuse to award damages for pain and suffering if the plaintiff is unable to prove that the decedent consciously experienced the time between an attack and his or her death. *Estate of Botvin*, 873 F. Supp. 2d at 244.

### b. Economic loss

Economic loss damages can be recovered pursuant to § 1605A(c). Such damages may be proven by the submission of a forensic economist's expert report. *Belkin*, 667 F. Supp. 2d at 24. In considering an award for lost future earnings, the Court shall take account of the reasonableness and foundation of the assumptions relied upon by the expert. *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 214 (D.D.C. 2012). For example, in *Belkin*, the court awarded economic damages

based on its conclusion that expert testimony before it was based on reasonable assumptions about the plaintiff's likely earnings if she had survived, including the length of time she would have worked and received retirement benefits. *Belkin*, 667 F. Supp. 2d at 24.

### c. Solatium

Solatium under the FSIA is functionally identical to IIED. *Id.* at 22. It is a form of damages intended to compensate persons for "mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience . . . as well as the harm caused by the loss of the decedent['s] society and comfort." *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011) (internal citation and quotation marks omitted). Courts may presume that those in direct lineal relationships with victims of terrorism suffer compensable mental anguish. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998) (discussing solatium damages under the prior version of the statutory state-sponsored terrorism exception to foreign sovereign immunity). As for siblings, testimony proving a close emotional relationship will usually be sufficient to sustain an award of solatium damages. *Id.*

This Court developed a standardized approach for evaluating IIED claims for solatium damages in *Estate of Heiser*, where it surveyed past awards to family members of victims of terrorism to determine that, based on averages, "[s]pouses typically receive greater damage awards than parents, who, in turn, typically receive greater awards than siblings." *Estate of Heiser*, 466 F. Supp. 2d at 269. Relying upon its evaluation of past average awards, the *Heiser* Court articulated a framework in which parents of deceased victims were awarded approximately $5 million and siblings received $2.5 million. *Id.*; *see also Valore*, 700 F. Supp. 2d at 85 (observing that this framework has been adopted by other courts as an appropriate measure of solatium damages for the family members of victims of state-sponsored terror).

In applying this framework, however, courts must be wary that "[t]hese numbers . . . are not set in stone," *Murphy*, 740 F. Supp. 2d at 79, and that deviations may be warranted when, for example, "evidence establish[es] an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant [is presented]; and circumstances surrounding the terrorist attack [rendered] the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27.

### d. Punitive damages

Punitive damages are explicitly made available under § 1605A's cause of action to punish and deter foreign states from engaging in or materially supporting terrorism. *See Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012). Four factors are relevant in deciding the level of punitive damages appropriate in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Id.* (internal citation omitted). One additional factor is relevant: in situations where punitive damages have been awarded repeatedly against a defendant for the same conduct in a series of lawsuits, the Court should consider whether to limit such damages so as not to over-punish that defendant for that particular conduct. *See Murphy*, 740 F. Supp. 2d at 81. In cases where this factor has been salient, the Court has tied punitive damages to compensatory damages by applying a multiplier to the amount of compensatory damages awarded. *Id.* at 81–83. The Court has also tied punitive damages to compensatory damages by applying a multiplier to the amount of compensatory damages awarded when the plaintiff in a case has not presented evidence relating to a country's actual expenditures

on terrorist activities. *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 49–51 (D.D.C. 2012).

As to the factors relating to the need for deterrence and the wealth of the defendants, this Court has repeatedly adopted a method for calculating an appropriate amount of damages based on the magnitude of the defendant's support for terrorism. The Court has generally considered an estimate of the defendant state's annual expenditure in support of terrorist organizations and applied a multiplier to it, usually between three and five. *Haim v. Islamic Republic of Iran*, 784 F. Supp. 2d 1, 13 (D.D.C. 2011). This method is calibrated to produce an award that, while proportional to a defendant's acts, is large enough to have a deterrent effect on the foreign state. *Estate of Heiser*, 659 F. Supp. 2d at 30–31.[8]

### e. *Prejudgment interest*

Whether to award prejudgment interest is a matter committed to the discretion of the court, subject to equitable considerations. *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997). Prejudgment interest may be awarded on compensatory damages but there are limitations on when such awards are appropriate. First, prejudgment interest should not be added to economic loss damages when such awards are already discounted to present value because this would result in double counting of the interest multiplier. *Amduso*, 61 F. Supp. 3d at 53–54. Also, this Court has consistently declined to award prejudgment interest on solatium damage awards calculated according to the *Heiser* framework outlined above. *Oveissi*, 879 F. Supp. 2d at 58–59. This is

---

[8] This method of calculating punitive damages in § 1605A cases remains valid, despite recent Supreme Court precedent strengthening constitutional protections against large punitive damage awards, because "foreign sovereigns cannot use the constitutional constraints of the Fifth Amendment due process clause to shield themselves from large punitive damages awards." *Bodoff*, 907 F. Supp. 2d at 106. Also, the Supreme Court's punitive damages jurisprudence in the field of maritime law—articulated in *Exxon Shipping Co. v. Baker*, 554 U.S. 471 (2008)—need not and should not be extended to change the method for calculating punitive damages in FSIA cases. *See Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 22–26 (D.D.C. 2011) (extensively discussing the issue and providing three independent reasons for not extending the Supreme Court's *Exxon* decision to cover § 1605A suits).

because the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing. *Id.*

## 2. Application

The Court begins by considering the threshold issue of whether defendants' actions were reasonably certain to cause the consequences complained of. All damages in this case spring from Malka Roth's death and the pain and suffering her family experienced as a result. Such consequences were "reasonably certain" to occur as a result of defendants' material support of Hamas' terrorist activities. Indeed, expert testimony indicates that this fact was clear even to Syria. *Cf. Braun*, 228 F. Supp. 3d at 82–83 (citing expert declarations explaining that Syria provided material support to Hamas, a known terrorist organization, "which has as its goal the targeting of civilian for acts of terror," and concluding that Syria's "conduct in supporting Hamas was likely, and intended, to result in injury and death to civilians and to devastate the families of the victims"). Therefore, the Court will next evaluate each plaintiff's entitlement to an award and the appropriate amount.

### a. Estate of Malka Roth

The estate of Malka Roth seeks damages (1) for her pain and suffering before death and (2) for economic losses accruing to her estate. This Court analyzed these same issues in *Roth I*. The Court concluded that it could not award Malka Roth's estate any damages for pain and suffering for the period between the bombing and her death because no evidence was submitted that Malka was conscious for any period of time between the bombing and her death. *Roth I*, 78 F. Supp. 3d at 404–05. The Court did award the estate of Malka Roth an economic loss damages award of $1,191,019. *Id.* This Court adopts these findings and conclusions made in *Roth I* and

finds that Syria and the Syrian Air Force Intelligence shall be jointly and severally liable for this judgment.

### b. Family of Malka Chana Roth

The following members of Malka Roth's family seek solatium damages for IIED: her mother Frimet and her siblings Pesia, Rivka, Zvi, Shaya, and Pinchas. Again, the Court analyzed these same issues in *Roth I*. The Court concluded that these family members sufficiently demonstrated the sort of personal connection and mental anguish resulting from her death to support an award of solatium damages. *Id.* at 405–06. The Court determined that it would not make an upward or downward departure from the normal solatium framework applied in state-sponsored terrorism cases. *Id.* Accordingly, the Court concluded that "Frimet Roth shall receive $5 million and five of Malka's siblings—Pesia, Rivka, Zvi, Shaya, and Pinchas—shall each receive $2.5 million in solatium damages." *Id.* at 406. This Court adopts these findings and conclusions made in *Roth I* and finds that Syria and the Syrian Air Force Intelligence shall be jointly and severally liable for this judgment.

### c. Punitive damages

Analysis of the four factors relevant to an award of punitive damages shows that a substantial award of punitive damages is justified in this case. Regarding the first factor—the character of the defendants' acts—defendants' material support for Hamas' terrorist activities is truly awful and worthy of the gravest condemnation. The second factor also points to a substantial award; the harm caused by defendants' support is among the worst imaginable—the death of an innocent child and the emotional devastation of her family. Further, the Court has never before awarded punitive damages against Syria in a case arising out of this incident. Thus, the Court finds

Syria's acts sufficiently outrageous to justify punitive damages and there is no need to reduce the level of punitive damages in light of prior awards.

Although plaintiffs ask the Court to adopt the same punitive damages award against Syria as was awarded against Iran in *Roth I*, plaintiffs have not presented evidence related to Syria's actual expenditures on terrorist activities. Therefore, to the extent that Syria and the Syrian Air Force Intelligence are severally liable from the judgment issued against Iran and MOIS in *Roth I*, the Court will use the compensatory damages value as the multiplicand to determine the punitive damage award against the present defendants. This is the standard that the Court has used in other cases in which plaintiffs have not presented evidence of a foreign nation's actual expenditures on terrorist activities. *See Harrison*, 882 F. Supp. 2d at 49–51. The multiplier has ranged between three and, in exceptional cases, five. *See Haim*, 784 F.Supp.2d at 13; *Valore*, 700 F. Supp. 2d at 88–89. The Court concludes, based on an analysis of prior cases of this type, that a multiplier of three is appropriate; plaintiffs have not offered a reason to depart from the usual practice in state sponsored terrorism cases. *See, e.g.*, *Beer v. Islamic Republic of Iran*, 789 F. Supp. 2d 14, 26 (D.D.C. 2011). Therefore, the plaintiffs are entitled to a punitive damages of three times the compensatory damages to be apportioned according to each plaintiff's share of compensatory damages. The Court awards $18,691,019 in compensatory damages and accordingly awards $56,073,057 in punitive damages.

### d. Prejudgment interest

Plaintiffs have requested prejudgment interest. The Court concludes, however, that it cannot award such interest. First, the economic loss damages awarded to the estate of Malka Roth have already been discounted to present value. Pls.' Mot. Def. J. and Damages Mem. Ex. D, 3, *Roth v. Islamic Republic of Iran et al.*, 78 F. Supp. 3d 379, Civil Action No. 11-1377 (RCL)

(D.D.C. Oct. 2, 2014), ECF No. 34-5. Second, the Court does not award prejudgment interest on solatium damage awards that are based on the *Heiser* framework. These rules encompass every type of compensatory damages the Court is awarding in this case.

## V. CONCLUSION

For the foregoing reasons, the Court finds that defendants Syria and the Syrian Air Force Intelligence are jointly and severally liable for the death of Malka Roth and injuries to her family. The Court in *Roth I* awarded plaintiffs $18,691,019 in compensatory damages in the proportion set forth in the Order and Judgment in *Roth I*. This Court now finds that defendants Syria and the Syrian Air Force Intelligence are jointly and severally liable for this amount. Further, to the extent that Syria and the Syrian Air Force Intelligence are severally liable, the Court finds that plaintiffs are awarded $56,073,057 in punitive damages, in the proportions set forth in the Order and Judgment in *Roth I*.

SIGNED this 28th day of September, 2018.

Royce C. Lamberth

Royce C. Lamberth

United States District Judge